UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| ROBERT JOHN LOW, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 09-72-ART |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION &** |
| LOWE'S HOME CENTERS, INC., et al., | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

*One day* after he bought his new miter saw, Rob Low noticed something. When he lowered the saw to commence cutting, it "hung up" and required him to force the saw past the hang-up point. The jury gets to decide whether this proves the saw had a manufacturing defect—and whether that defect was a "substantial factor" in Low's injury. The defendants' motion for summary judgment is denied in part.

## BACKGROUND

On April 15, 2007, Rob Low bought a Rexon sliding compound miter saw, R. 1, Attach. 4 at 2. He brought it home, sealed in an undamaged box. R. 46, Ex. F ("Low Depo.") at 29, 216. He opened it and "looked at every page" of the owner's manual, which warned "DO NOT FORCE THE TOOL"; "ALWAYS keep the blade guards in place"; "Check for . . . binding of moving parts"; and repair or replace "a guard . . . that is damaged." *Id.* at 47; Ex. N. ("Manual") at 3, 4. Quickly assembling the saw, he noticed no missing parts or problems with the blade guard, which properly covered the blade in resting position. Low Depo. at 48, 115, 207.

The very next day, Low and his friend Kermit Lang began construction of a wheelchair ramp. *Id.* at 31-32, 35. Putting the saw to work for the first time, they encountered a "hang-up" while lowering it into the cutting position. *Id.* at 176. They had to apply a "considerable amount of force . . . to get past where it hung," *id.* at 55, but they nonetheless completed the project. The ramp, it turns out, was just the first in a series of projects during which the saw would hang up—with increasing stubbornness. *See* R. 46., Ex. J ("Collins Depo.") at 11; Ex. I ("Lang Depo.") at 15.

The problem, allegedly, was binding in the blade guard's linkage, which caused the linkage to bend and grew worse with time. R. 46, Ex. K ("Riggs Report") at 3. This binding and bending not only caused the saw to hang up, but—as Mr. Low himself noticed once or twice, Low Depo. at 191-92—also caused the blade guard to stick open on occasion. *Id.*; Lang Depo. at 19; Collins Depo. at 11-12.

A year after the wheelchair ramp project, Low was working on another project. One night, while using the saw, a piece of wood he was cutting snapped and threw his hand across the spinning blade, *id.* at 103-04, resulting in serious injury. Low says that the saw was no longer in the cutting position when his hand made contact, *id.* at 205-06—meaning the blade guard should have covered the blade—but he does not actually remember noticing the guard's position until after his injury. At that point, he says, it was stuck open. *Id.* at 99-100.

Low sued, alleging that the saw had design, manufacturing, and warning defects; that the defendants were negligent in producing and selling the saw; and that the defendants breached an implied warranty that the saw was fit for its intended use. R. 1, Attach. 4. The defendants

moved for summary judgment.

## DISCUSSION

I.    **Design Defect**

The defendants are correct that Low cannot sustain *some* of his causes of action.  For starters, this is not a design defect case.  In a true design defect case, whether based on a negligence or strict liability theory, *Jones v. Hutchinson Mfg., Inc.*, 502 S.W.2d 66, 69-70 (Ky. 1973) , the plaintiff must show that the "design itself selected by the manufacturer"—the plan, structure, choice of materials, and specifications, *id.* at 69—was "unreasonably dangerous." *Nichols v. Union Underwear Co.*, 602 S.W.2d 429, 433 (Ky. 1980).  Low makes no such allegation.  Although his expert initially filed a report seeming to say the Rexon saw's design was defective, Riggs Report at 1-3, he more recently abandoned that position and instead claims that the particular saw in this case was assembled improperly.  R. 46, Ex. L ("Riggs Depo.") 16-17.  And Low's brief makes no argument about the product's overall design, emphasizing his expert's current position instead.  *See* R. 50 at 6-8.

In fact, even if Low does mean to assert a true design defect claim—resting on his expert's abandoned initial assessment—his evidence is insufficient.  To prove a design defect, he must show that the defendants could have used a safer, and still feasible, design.  *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 42 (Ky 2004).  He presents no such proof here.[1]

---

[1]    Prevailing on the design defect claim, the defendants make some hay about KRS § 411.310, which says that if a product's design, testing, and method of manufacture conform to industry standards, "it shall be presumed, until rebutted by a preponderance of the evidence . . . that the product was not defective."  But the purpose of the statute is simply "to protect a manufacturer from liability for failure to anticipate safety features which were unknown or

## II.    Failure to Warn

Nor can Low maintain his claim that the defendants failed to adequately warn him. Kentucky law gives a products-liability plaintiff two possible routes to lodge such a challenge. First, the strict liability route: A plaintiff can show that a manufacturer failed to apprise him of dangers inherent in the design of the product, rendering it unreasonably dangerous. *Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1149 (6th Cir. 1996) (citing *C&S Fuel, Inc. v. Clark Equip. Co.*, 552 F. Supp. 340, 347 (E.D. Ky. 1982). For example, a drug manufacturer might fail to alert customers that its product is unsafe for patients with high blood pressure. *C&S Fuel*, 552 F. Supp. at 347; *see also Byrd v. Proctor & Gamble Mfg. Co.*, 629 F. Supp. 602, 605 (E.D. Ky. 1986) (accurate replica of a revolver with a safety purposely below the modern state of the art requires a warning to escape strict liability (citing *Sturm, Ruger & Co. v. Bloyd*, 586 S.W.2d 19 (Ky. 1979)). Or, second, a plaintiff can show that the manufacturer negligently failed to warn him of foreseeable risks. *Id.*; *see also Tipton*, 101 F.3d at 1149. That is, he can prove that a manufacturer knew or had reason to know that its product was likely to be dangerous, had no reason to expect the plaintiff would know it, and failed to exercise reasonable care to give an adequate warning. *Tipton*, 10 F.3d at 1149-50.

---

unavailable at the time the product in question was manufactured and distributed." *Owens-Corning Fiberglas Corp. v. Golightly*, 976 S.W.2d 409, 411 (Ky. 1998). It does nothing to change the plaintiff's burden in warning or manufacturing defect claims. For those, the statute merely reiterates the plaintiff's usual burden to prove, by a preponderance of the evidence, that the product suffered a warning or manufacturing defect if it suffered no design defect. *See, e.g.*, *Clark v. Chrysler Corp.*, 310 F.3d 461, 476 (6th Cir. 2002), *vacated on other grounds by Chrysler Corp. v. Clark,* 540 U.S. 801 (2003); *Boon Edam, Inc. v. Saunders*, 324 S.W.3d 422, 432 (Ky. App. 2010); *Leslie v. Cincinnati Sub-Zero Prods., Inc.*, 961 S.W.2d 799, 803-804 (Ky. App. 1998).

Low has not presented evidence, viewed in the light most favorable to him, upon which a reasonable jury could conclude that the defendants failed to warn under either theory. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). To begin, he makes no argument that the defendants failed to warn about a danger inherent in the design of the saw. Instead, he says that the defendants failed to warn him that his *particular* saw was broken—that "this new saw was not operating as the manufacturer intended." *See* R. 50 at 12-13. And even with this allegation, he cannot show that the defendants negligently failed to adequately warn of foreseeable dangers. Not only has he failed to supply any evidence that the defendants knew or should have known about any assembly problems with this particular saw (or the line of saws), but the warnings the defendants *did* give were clearly sufficient to apprise him of foreseeable risks. To repeat, the owner's manual, which Low says he read, admonished: "DO NOT FORCE THE TOOL;" "ALWAYS keep the blade guards in place"; "[c]heck for . . . binding of moving parts"; and repair or replace "a guard . . . that is damaged." Given Kentucky's rule that manufacturers need not warn of "obvious" dangers or "every conceivable risk," *Edwards v. Hop Sin, Inc.*, 140 S.W.3d 13, 16 (Ky. App. 2003), what more should the defendants have said?

Perhaps Low has done so little to support his design-defect and failure-to-warn claims because he wrongly believes he only needs to give circumstantial evidence that *something* was amiss with *his* saw. He argues that "to withstand a motion for summary judgment as to liability in a Kentucky products liability case, the Plaintiff 'is not required to establish precisely *why* the [product] failed, but *whether* it did.'" R. 50 at 10 (citing *Siegel v. Ky. Farm Bureau*, No. 3:08-0429, 2010 WL 4536769, at *3 (W.D. Ky. Nov. 2, 2010)). The argument seems to be that the

different products liability theories—design defect, warning defect, manufacturing defect—are all just glosses on one single product-defect cause of action, and so he only needs to present evidence that the product had *some* defect to carry all three past summary judgment.

But he misreads Kentucky law. While these theories are related, they are still different bases for relief. *See, e.g.*, *Clark v. Hauck Mfg. Co.*, 910 S.W.2d 247, 250 (Ky. 1995) *overruled on other grounds* by *Martin v. Ohio Cnty. Hosp. Corp.*, 295 S.W.3d 104 (Ky. 2009) ("Each theory is different and therefore independent of the other."). And the case Low relies upon, *Siegel*, does not really help him. The *Siegel* court held only that the plaintiff, who had circumstantial evidence to suggest a manufacturing defect—and concededly not a design defect—could proceed to trial even though he could not eliminate other potential, external causes at that stage. *Siegel*, 2010 WL 4536769, at *1. It did not go so far as to hold that a plaintiff can maintain all three product-defect theories against summary judgment with evidence to support only one and, importantly, with evidence clearly repudiating two.

Low might respond with cases more clearly on point—cases where the court did seem to hold that a plaintiff could maintain an omnibus defect claim with circumstantial evidence that *something* went wrong. In *Perkins v. Trailco Mfg. and Sales Co.*, 613 S.W.2d 855, 857-58 (Ky. 1981), for instance, the court held that while there was no "direct proof of a specific defect" in the subject trailer, the evidence was still sufficient to show that a defect in the trailer, "design or otherwise," caused the injury. The court reasoned that the trailer malfunctioned despite being brand new and that the plaintiff could eliminate other potential causes. *Id.* Similarly, the court in *Kentucky Farm Bureau Mutual Insurance Co. v. Hitachi Home Electric, Inc.*, held that the

plaintiff could preserve his generalized defect claim without identifying a particular defect because he had circumstantial evidence to support his claim and because he could eliminate other potential causes. No. 08-30, at *3, 4-5, 7 (E.D. Ky. Aug. 26, 2009), *available at* http://docs.justia.com/cases/federal/district-courts/ Kentucky/kyedce/3:2008cv00030/57422/30/. *But see Gray v. Gen. Motors Corp.*, 133 F. Supp. 2d 530, 534 (E.D. Ky. 2001). But this case is different from *Perkins* and *Hitachi Home*. Unlike those cases, the record here includes evidence *negating* two defect theories. There is no reason to let them go to trial as riders on the manufacturing-defect claim.

## III. Manufacturing Defect

But while Low may not have a design or warning defect claim, he does have a manufacturing defect claim. To prevail on this third theory, a litigant must show that a product "was not manufactured or assembled in accordance with its specifications" and that the deviation was a "substantial factor" in his injury. *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 788 (6th Cir. 2005).[2] To do this, he can rely on circumstantial evidence if it is enough to "tilt the balance from possibility to probability" that a manufacturing defect was a cause of the accident. *Id.*

---

[2]     As best the Court can tell, this is the full extent of the test for deciding whether there was a manufacturing defect. Some decisions could be read as saying that courts should decide whether there is a defect not just based on problems with the design or assembly of a product, but also the feasibility of making a safer product, patency of the danger, warnings and instructions, subsequent maintenance and repair, misuse, and the product's inherently unsafe characteristics. *Busch v. Ansell*, No. 3:01CV126H, 2005 WL 877805, at *4 (W.D. Ky. Mar. 8, 2005) (citing *Montogomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780-81 (Ky. 1984)). But, really, these factors appear to apply only to design defect cases. *See Ford Moto Co. v. Fulkerson*, 812 S.W.2d 119, 128 (Ky. 1991) (Spain, J., dissenting).

Low has done precisely this. While he presents no direct evidence that the saw was damaged when he bought it, or that the damage was the cause of his injury, he has plenty of circumstantial evidence that it was. He testified that he discovered the hang up just *one day* after he bought the saw, brand new in a sealed, undamaged box. *See Perkins*, 613 S.W.2d at 858 (holding that product's malfunction while still new was circumstantial evidence of a defect). That hang up, his expert says, appears to have been the result of binding and bending in the link that is supposed to cause the blade guard to lower as the saw returns to resting position. That binding and bending also purportedly caused the blade guard to stick open on occasions. Low remembers the blade guard sticking open immediately after his injury. Viewing all of this in a light most favorable to Low, a reasonable jury could find that the linkage "probably" suffered binding when Low brought it home, that the binding caused the linkage to bend and that by causing the blade guard to stick open, it was a substantial factor in allowing his hand to come into contact with the spinning blade.

The defendants' responses are unconvincing. First, they say that Low's own expert acknowledges that it is "possible" Low may have damaged the saw himself by using the linkage to lift the saw from the box or dropping a tool on the saw. R. 46 at 18 (citing Riggs. Depo. at 58-59). Certainly true. But that does not mean a reasonable jury would be compelled to conclude that those possibilities are just as likely as Low's manufacturing-defect theory. Remember, the circumstantial evidence that Low bought the saw damaged, and that he was unlikely to damage it himself, is not insubstantial. Low, an "experienced carpenter," R. 46, Attach. 1 at 1, bought the saw in a sealed, undamaged box, assembled it, conscientiously read

"every page" of the owner's manual, and tested the saw to make sure it moved correctly. Low Depo. at 49. And, importantly, we know he discovered the hang up during its *very first* use—just *one day* after the purchase. *See Perkins*, 613 S.W.2d at 858 (holding that product's malfunction while still new was circumstantial evidence of a defect). And what contrary evidence do the defendants have that this "experienced carpenter," R. 46, Attach. 1. at 1, was the one who damaged the saw *immediately* after he bought it? Basically none. The defendants point to virtually nothing in the record to suggest Low mishandled the saw immediately out of the box or dropped anything on it at that early stage. Indeed, the only evidence that someone might have contributed to the linkage problem at *any* time between the purchase of the saw and Mr. Riggs's later analysis of it is that someone appears to have "used a screwdriver on the heads attached to the bent linkage." R. 46, Attach. 1 at 19. Viewing the evidence in the light most favorable to Low, a reasonable jury could conclude that it is marginally more likely that the saw was damaged on arrival.

Contrary to the defendants' claim, the Sixth Circuit's holding in *Greene v. B. F. Goodrich Avionics* does not raise the "degree of proof" necessary for Low's claim to survive. There, a helicopter crashed on a foggy day after the pilot was heard to say, "Okay I think my gyro just quit." 409 F.3d at 787. The gyroscope was a sensor in the nose of the helicopter which fed data to the Attitude Display Indicators ("ADIs"), which, in turn, told the pilot the helicopter's position relative to the earth. *Id.* The pilot's wife sued, alleging that the gyroscope had a manufacturing defect. In support, she submitted records revealing multiple gyroscope replacements for both the subject helicopter and the rest of the fleet in the six-month period before the crash. She also

presented data indicating the ADI's reading of the plane's position during the crash was wrong. *Id.* And she called an expert, who testified that gyroscope failure was more likely than the possibility that wiring between the gyroscope and ADI failed because the former was more common. *Id.* The court held that the defendant was entitled to a directed verdict, not because the "degree of proof" was elevated, but instead because—unlike here—it was "equally" likely that the ADI, not the gyroscope, failed. *Id.* at 792. The court explained that there was no way to know whether the number of gyroscope replacements was unusual; that many ADIs were replaced as well; that the record included no information about the expected life of a gyroscope; that work orders for recently replaced gyroscopes revealed that the gyroscopes were tested or exhibited no problems; and that it was quite possible other problems caused the crash because the pilot could have relied on other ADIs. *Id.* at 791-92.

Nor do the defendants succeed in completely discrediting the claims of Low's expert. They say he failed to employ any "empirical" or "scientific" testing to determine whether the linkage binding and bending were the cause of the blade guard's sticking or to determine whether the binding occurred during the manufacturing process. R. 46, Attach. 1. at 18-20. For example, they say, the expert failed to determine the "metallurgical make-up" of the linkage. *Id.* at 20. And, they add, the expert relies on Low's testimony to decide when the binding and bending began. *Id.* But, whatever tests the expert failed to take, he still examined the saw and determined, with his trained eye, that the blade guard linkage suffered binding and bending at the time he examined it, and that the binding and bending caused both the saw to hang up and the blade guard to stick open. And even if it is true that the expert has no way of independently

determining when the binding and bending began, Low's testimony that he experienced problems with the saw from day one is enough to suggest the binding and bending started then.

Finally, the defendants unpersuasively argue that Low has not shown that whatever manufacturing defect existed was "*the* cause" of his injuries. R. 46, Attach. 1 at 21 (emphasis added). Instead, they say, the real cause was Low's failure to heed the warnings and the common sense judgment that he should not continue to use a saw that hung up and had blade guard problems. But this argument suffers two shortcomings.

First, Kentucky law does not require that a manufacturing defect be the only cause of Low's injuries. Instead, it requires simply that it be "*a* substantial factor," *Greene*, 409 F.3d at 788 (emphasis added)—meaning "a legal cause," *Perkins*, 613 S.W.2d at 857, or something "reasonable men" would regard as a cause, using the word "in the popular sense," *Deutsch v. Shein*, 597 S.W.2d 141, 144 (Ky. 1980). Certainly, the defendants make a strong case that Low was less than responsible in overlooking the hang up and blade guard problems, particularly when considered against the backdrop of the product's ample warnings and his own expert's testimony that he would have stopped using the saw before the accident. R. 46, Attach. 1 at 21-26; Riggs Depo. at 82-83. That irresponsibility doubtless played a role in the accident. But was it *all* his fault? Was Low *completely* unreasonable? Not necessarily. He testified that this was the first time he had bought a saw of this kind and that he had no reason to believe this brand new saw was operating other than as it was intended. Low Depo. at 49-50. And he personally only noticed the blade guard stick open once or twice. Low Depo. 191-92. A reasonable jury could conclude that the manufacturing defect was also *a* substantial factor contributing to Low's

11

injury.

Second, even assuming the warnings and obviousness of the danger in this case makes Low primarily responsible for his injury, it is unclear simply dismissing his manufacturing defect claim would be the correct way to account for his fault in this case. It usually is not the correct way in design defect cases, at least. *See, e.g.*, *Busch*, 2005 WL 877805 at *4; *Nichols*, 602 S.W.2d at 432-433. (Though it is true a different rational might apply to manufacturing defect claims. *See supra* note 2.) And Kentucky law already supplies an alternative means of accounting for Low's own negligence—apportioning damages. *Owens Corning Fiberglass Corp. v. Parrish*, 58 S.W.3d 467, 475 (Ky. 2001).

Neither of the cases the defendants cite is to the contrary. They say that *Vaughn v. Alternative Designs*, No. 07-429, 2008 U.S. Dist. LEXIS 82325 (E.D. Ky. Oct. 16, 2008) and *Hood v. Ryobi Am. Corp.*, 181 F.3d 608 (4th Cir. 1999) support their view that, where a plaintiff behaves irresponsibly in handling a product, a defect in the product is not the cause of his injuries. But in *Vaughn*, the product the defendant actually produced was quite clearly not responsible for the plaintiff's injuries. There, a chicken-house employee stepped on a manure-removing auger missing its safety guards. *Vaughn*, 2008 U.S. Dist. LEXIS 82325, at *1-2. He sued the company who installed component parts for the auger at issue. *Id.* at *2. The court held that the defendant's conduct was not the cause of the plaintiff's injuries because he only installed auger components and had never been charged with also installing safety guards. In fact, others were responsible for adding the safety guards, and the defendant had no control over installation of those guards. *Id.* at *15-19. And in *Hood*, there was simply nothing wrong with the subject

saw as designed. The saw had ample warnings and a safety guard that would have prevented the plaintiff's injury—the blade flying off the saw and attacking him. 181 F.3d at 609, 611-12. Yet the plaintiff made the unfortunate decision to remove the blade guard himself to cut a piece of wood without ever reattaching the guard. *Id.* at 609. This case is different from *Vaughn* and *Hood*, therefore, because the defendants were responsible for manufacturing the saw in its entirety and because there is virtually no evidence Low altered the saw or failed to assemble it correctly.

As to Low's remaining claims: The defendants' solitary argument for dismissing Low's generalized negligence and breach-of-warranty causes of action is that they must fail if Low cannot first show a defect. R. 46, Attach. 1 at 12. Because Low can still pursue his manufacturing defect claim, the defendant has not shown that these lingering claims should be dismissed.

## CONCLUSION

The defendants' motion for summary judgment, R. 46, is therefore **GRANTED IN PART AND DENIED IN PART.** Only Low's design and warning defect claims are dismissed.

This the 14th day of February, 2011.



Signed By:

*Amul R. Thapar*

United States District Judge